## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL T. SLOANE, CRUISE CONNECTIONS INC., TRACEY KELLY, SUSAN EDWARDS, AND CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:08CV381 |
| DENNIS LALIBERTE, NEWWEST TRAVEL AND CRUISES LTD.; NEWWEST TRAVEL LTD., AND NEWWEST SPECIAL PROJECTS LP, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on "Defendants' Motion to Dismiss Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the Alternative for *Forum Non Conveniens*" filed by Dennis Laliberte ("Laliberte") and Newwest Travel and Cruises Ltd. ("NTC") (Docket Entry 34); and "Additional Defendants' Motion to Dismiss Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the Alternative for *Forum Non Conveniens*" filed by Newwest Travel Ltd. ("NT") and Newwest Special Projects, L.P. ("NSP") (collectively Laliberte, NTC, NT and NSP are referred to as "Defendants") (Docket Entry 47). Through the two motions, Defendants seek dismissal of this action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); alternatively, they request dismissal of this matter pursuant to the doctrine of forum non conveniens. (Docket Entry 34 at 1; Docket Entry 47 at 1.) For the reasons that follow, personal

jurisdiction over Defendants is lacking. Accordingly, it is recommended that Defendants Laliberte and NTC's Motion to Dismiss (Docket Entry 34), and Defendants NT and NSP's Motion to Dismiss (Docket Entry 47) both be granted.

## I.  BACKGROUND

"Plaintiff Michael T. Sloane ("Sloane") is a citizen and resident of Forsyth County, North Carolina." (Docket Entry 28 at 2.) "Plaintiff Cruise Connections, Inc., [("CC")] is a North Carolina corporation with its principal place of business located in Winston-Salem, North Carolina. . . . [Plaintiff] Sloane is the president and owner of [Plaintiff CC]." (Id.) "Plaintiff Tracey Kelly ("Kelly") is a citizen and resident of King County, Washington." (Id.) "Plaintiff Susan Edwards ("Edwards") is a citizen and resident of Victoria, British Columbia, Canada." (Id.) "[Plaintiff] Cruise Connections Charter Management 1, LP ("CCCM") is a North Carolina limited partnership with its principal place of business located in Winston-Salem, North Carolina." (Id.)

The Amended Complaint filed by Sloane, CC, Kelly, Edwards and CCCM (collectively "Plaintiffs") seeks a declaratory judgment and monetary award from Defendants arising out of a failed business relationship to provide cruise-ship accommodations during the 2010 Winter Olympic Games. (Docket Entry 28 at 5-9, 12-13.)

According to Defendant Laliberte's affidavit, "[he is] a citizen and resident of Edmonton, Alberta, Canada and [is]

President of Defendant [NT]." (Docket Entry 35, Ex. A at 1.)
Moreover:

> [Defendant Laliberte has] never been to . . . North
> Carolina, do[es] not maintain offices or agents or
> employees in North Carolina, do[es] not own property
> there, ha[s] not engaged in long-term business
> transactions there, did not solicit Plaintiffs' business
> in North Carolina, did not contractually agree to [its]
> governing laws . . ., never made in-person contacts in
> North Carolina with any Plaintiff, and [is] not doing
> business in . . . North Carolina. . . . Further, [he
> has] not consented to be sued in . . . North Carolina.

(Id., Ex. A at 2.) Plaintiffs allege that Defendant NTC is
"organized . . . under the laws of the Province of Alberta, Canada
with [its] principal place of business located in Edmonton, Alberta
Canada" and Defendant Laliberte is its President. (Docket Entry 28
at 2-3.)[1]

Defendant Laliberte avers that "Defendant [NT] is a Canadian
corporation formed, existing, and doing business in the Province of
Alberta, Canada." (Docket Entry 35, Ex. A at 2.) He further
swears that:

> 4. [Defendant NSP] is a limited partnership, of
> which [he is] a partner. . . . [Defendant NSP] was formed
> in Alberta, Canada, on January 15, 2009, which was after
> the events complained of in the Amended Complaint.

---

[1] Defendant Laliberte avers that he is "unaware of a legal entity known as
'Newwest Travel and Cruises, Ltd.'" (Docket Entry 35, Ex. A at 2), but the motion
filed by Defendants Laliberte and NTC describes him as the "President of NTC,
which the motion identifies as "a Canadian corporation formed, existing, and
doing business in the Province of Alberta, Canada" (Docket Entry 34 at 2).
Defendants Laliberte and NTC have made no attempt to resolve this conflict in
their brief or reply (see Docket Entries 35, 45.) As discussed below, the Court
resolves all factual disputes in Plaintiffs' favor (see infra at 11), therefore,
the Court finds that, for current purposes, Defendant Laliberte is the President
of NTC.

5.   Neither [Defendant NT], nor [Defendant NSP], conduct business in the state of North Carolina, own property or other assets in North Carolina. [Defendants NT] and [NSP] do not maintain offices or agents in North Carolina; did not solicit the Plaintiffs' business in North Carolina; did not engage in significant or long-term business in the forum; did not contractually agree to the governing laws of North Carolina; and did not make in-person contact in North Carolina with Plaintiffs regarding the business relationship.

(Docket Entry 48, Ex. A at 2; accord Docket Entry 35, Ex. A at 2.)

According to the Amended Complaint, the Vancouver 2010 Integrated Security Unit ("V2010-ISU") was responsible for providing security for the 2010 Winter Olympic and Paralympic Games held in Vancouver and Whistler, British Columbia, from February 12-28, 2010.  (Docket Entry 28 at 3-4.)  Plaintiffs allege that V2010-ISU planned to house security personnel on cruise ships in Vancouver harbor and requested submission of bids for the housing contract by May 23, 2008.  (Id. at 3.)  Plaintiffs claim that V2010-ISU's bidding requirements included "a letter of credit equal to 10% of the bid[.]"  (Id.)

In June of 2007, Plaintiff Edwards approached Defendant Laliberte in Louisiana  (Docket Entry 35, Ex. A at 3); Plaintiffs Edwards and Sloane met with Defendant Laliberte regarding jointly bidding on the V2010-ISU's housing contract "as well as other cruise ship contracts for accommodations during the 2010 Winter Olympic Games" (Docket Entry 28 at 4-5).[2] According to Defendant

_____

[2] Defendant Laliberte avers that Plaintiff Edwards made the approach "to discuss bidding on the [V2010-ISU] Contract" (Docket Entry 35, Ex. A at 2), but does not refer to any other cruise ship accommodations (see id.).  As discussed below, the Court views the facts in a light most favorable to Plaintiffs.  (See
(continued...)

Laliberte, "Plaintiffs [] Kelly, [] Sloane, and [] Edwards came to Canada to negotiate and discuss the details of the partnership at some point during the planned business venture . . . ." (Docket Entry 48, Ex. A at 3.) Allegedly, Plaintiffs Edwards and Sloane and Defendant Laliberte agreed to work together and discussed forming a limited partnership, "but no partnership was ever formed in Canada or the United States." (Docket Entry 28 at 5.)

Plaintiffs assert that, on August 15, 2007, Plaintiffs Edwards, Sloane, and CC agreed with Defendants Laliberte, NT, and NTC that Plaintiff Edwards would "manage the project in Vancouver including negotiations with local port agents and local government officials[,]" while Plaintiffs Sloane and CC would "provide access to the cruise industry, to obtain contracts for cruise ships . . . and [would] develop a reservation and logistics system for the guests . . . ." (Id.) According to Plaintiffs, Defendants "Laliberte[] and [NT and NTC's] role in the Project was to provide the financing from himself [sic] and another financier necessary to bid on the [] contract as well as the other financing necessary for the Project." (Id.) Plaintiffs further state that "[Defendant] Laliberte and [Plaintiff] Sloane retained [Plaintiff] Kelly in October 2007 to provide assistance in acquiring cruise ships from their owners . . . and to negotiate contracts with service providers in . . . British Columbia." (Id. at 6; see also Docket Entry 41, Ex. A at 1.)

---

[2](...continued)
infra at 11.)

In addition, Plaintiffs claim that "[Plaintiff] Sloane and [Defendant] Laliberte made equal payments for the Project to [Plaintiffs] Edwards and Kelly through April 2008." (Docket Entry 28 at 6.) On August 8, 2007, Defendant Laliberte sent an e-mail to Plaintiff CC stating that, "[p]ursuant to our phone call this am [sic] confirming we will jointly pay the $10,000 fee per month due to [Plaintiff] Edwards for the HAL 2010 project. . . . Please send you [sic] $5000 check via fed ex payable to [Defendant NT] . . . ." (Docket Entry 21, Ex. D at 2.) Subsequent to that e-mail, Plaintiff CC issued five checks each for $5,000 (see id., Ex. D at 3-7): a check dated August 10, 2007, made payable to "Newwest Travel (Olympic Cruise)" (id., Ex. D at 3); a check dated February 12, 2008, and another dated January 24, 2008, both made payable to "Sue Edwards (Olympic Cruise)" (id., Ex. D at 4-5); a check dated February 8, 2008, and another dated March 17, 2008, both made payable to "Tracey Kelly (Olympic Cruise)" (id., Ex. D at 6-7).

Plaintiffs have alleged that, "[a]t all times, [Defendant] Laliberte represented to Plaintiffs that he had the financing necessary for the [V2010-ISU] bid as well as the financing for the rest of the Project[,]" and that he would "provide $5 million to $10 million of his own money for financing." (Docket Entry 28 at 6.) Allegedly, "[Defendant Laliberte] took charge of the Project based on his representations that he had acquired the financing . . . and, was providing millions of dollars of his own money . . . ." (Id. at 6-7.) Plaintiffs allege that Defendant Laliberte agreed to pay Plaintiffs Sloane and CC a per ship fee for

their "manage[ment] of the inventory and some ground operations" with respect to the V2010-ISU contract and a per passenger "booking fee for the ships with private accommodations." (Id. at 7.) According to Plaintiff Sloane, while Defendant Laliberte was "in charge" of the project "[he] sent over 75 emails to [Sloane] at [Sloane's] office in North Carolina setting forth instructions and discussing other issues related directly to the Winter Olympic project." (Docket Entry 21 at 2 (citing id., Ex. A).)

Plaintiff Sloane further avers that he and Defendant Laliberte "agreed that [Plaintiff CC's] reservation team would have to increase its size in Winston-Salem[, North Carolina,] by 5-11 employees . . ." and, "in May 2008, [Plaintiff Sloane] hired a lead reservantionists [sic] who was fluent in French . . . who was uniquely skilled to handle reservations from Canadians." (Docket Entry 21 at 3-4.) Moreover, Plaintiff Sloane claims that "[Plaintiff CC's] North Carolina based reservation system [] had to be customized for the Winter Olympic project" and "[he] hired John Hill [("Hill")] and [Hill's company] Hil-Tec[, Inc.] in North Carolina to make the changes . . . ." (Id. at 4.)

More specifically, Hill swore as follows:

> 7.  In July 2007, <u>Michael Sloane contacted me at my North Carolina office and requested that I work on changes and write codes for the Reservation System for a project he was working to place cruise ships at the 2010 Winter Olympic games</u>.

> 8.  Michael Sloane introduced me to Dennis Laliberte over the telephone.  <u>I understood Laliberte to be in charge of the project to bring cruise ships to the 2010 Winter Olympics.</u>

9. By the end of July 2007, Dennis Laliberte was communicating directly with me at my North Carolina office regarding changes I was making to the reservation System.

10. Laliberte sent at least <u>six emails</u> directly to me at my North Carolina office regarding customization to the Reservation System as well as Power Point presentations.

11. At Laliberte's request, I developed several Power Point presentations that illustrated the major features of how the Reservation System would work for the 2010 Winter Olympic project and how the system was currently working for other projects. I sent those presentations from my North Carolina office to Laliberte in Canada.

12. I incurred approximately $10,000 worth of charges in North Carolina providing technical support in the planning of customizations to the Reservation System for the 2010 Winter Olympic project and for the preparation of Powerpoint presentations, for which I have not been paid.

(Docket Entry 17, Ex. E at 2-3 (emphasis added).) Plaintiff Sloane avers that, "[e]ven though [Defendant] Laliberte communicated directly with Hill, [Plaintiff CC] was still responsible for Hill's bills." (Docket Entry 21 at 4.)

On April 3, 2008, Defendant Laliberte sent an e-mail to Plaintiffs Sloane and Edwards which stated in relevant part:

Pursuant to the policy with all contractors we are working with on the Vancouver 2010 project . . . we have instituted penalties for any projects not completed by agreed due dates.

All items contained herein on the attached document Olympics 2010 Booking Engine Modifications must be completed by May 15[,] 12:00 noon EDT. Failure to complete by the on [sic] agreed upon deadline will result in penalties of $500 per 24 hour period. This penalty will be assed [sic] to [CC] as they are the primary contractor with Hil-Tec Inc.

(Docket Entry 21, Ex. C at 2.)[3]  According to Plaintiffs, "[i]n April 2008, [Defendant] Laliberte unilaterally excluded [Plaintiffs] Sloane and [CC] from the Project."  (Docket Entry 28 at 7.)

Plaintiffs allege that, during a telephone call on May 6, 2008, between Plaintiffs Kelly and Edwards and Defendant and the alleged additional financier, Plaintiffs "Edwards and Kelly learned . . . that [Defendant] Laliberte did not have the financing in place . . ." and he allegedly told them "to 'find their own financing.'"  (Docket Entry 28 at 7.)  Plaintiffs assert that, on May 8 and 9, 2008, Defendant Laliberte advertised in Albertan and British Columbian newspapers unsuccessfully seeking financing for the project.  (Id. at 7-8.)[4]  In Plaintiffs' view, they "could not file a bid with V2010-ISU . . . or proceed with the other aspects of the Project[,]" because of the lack of financing and, "[o]n May 15, 2008, [Plaintiffs] Edwards and Kelly informed [Defendant] Laliberte that they were severing all ties with him . . . ."  (Id. at 8.)

Plaintiffs state that, on May 17, 2008, Plaintiffs Sloane, Kelly, and Edwards agreed to form a partnership "to obtain

_____

[3] The Court refers to the exhibits to Plaintiff Sloane's affidavit by the Case Management/Electronic Case Filing ("CM/ECF") system page numbers which appear in the footer of the document, because the exhibits do not have other pagination.  (See Docket Entry 21, Exs. A-D.)

[4] Plaintiffs claim that Defendant Laliberte's advertisements "were illegal under Canadian law and violated V2010-ISU regulations[,]" and, moreover, "[he] tried to secure financing through unrealistic profit and cost projections to potential investors."  (Docket Entry 28 at 8.)

financing and salvage their investments . . ." and, six days later, they formed Plaintiff CCCM pursuant to North Carolina law.  (Id.)  In the Plaintiffs' view, they "paid a significant premium for [] financing[,]" but they "secure[d] financing and filed a bid on May 23, 2008."  (Id. at 8-9.)  They further claim that, "[o]n June 3, 2008, V2010-ISU announced that Plaintiff CCCM was the successful bidder . . . ."  (Id. at 9.)

## II. DISCUSSION

Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) and, in the alternative, for Forum Non Conveniens.  (Docket Entries 34, 47.)  Plaintiffs have responded and Defendants have replied.  (Docket Entries 41, 45, 50, 52.)

### A.  Applicable Legal Standard

On a Federal Rule of Civil Procedure 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden "to prove grounds for jurisdiction by a preponderance of the evidence."  Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).  "If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question."  Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989) (emphasis added).  However, when a court examines personal jurisdiction "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing" of

personal jurisdiction.  Id.  Under such circumstances, a court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  Id.

"[I]n order for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied.  First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements."  Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).  "[I]t is apparent that the [North Carolina] General Assembly intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process."  Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977)).  "Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Christian Sci., 259 F.3d at 215 (internal quotation marks omitted) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

A court may have personal jurisdiction over a defendant through either general or specific jurisdiction.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984)).  "[I]f the defendant's contacts with the State are not

-11-

also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State. To establish general jurisdiction over the defendant, the defendant's activities in the State must have been continuous and systematic, a more demanding standard than is necessary for establishing specific jurisdiction." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). Specific jurisdiction exists when the "suit aris[es] out of or is related to the defendant's contacts with the forum . . . ." Helicopteros, 466 U.S. at 414 n.8. To determine the existence of specific jurisdiction, a court considers: "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" ALS Scan, 293 F.3d at 712.

As to the first prong of this inquiry, the United States Court of Appeals for the Fourth Circuit has identified the following "nonexclusive factors" that courts have considered "to resolve whether a defendant has engaged in [] purposeful availment" in the business context:

> . whether the defendant maintains offices or agents in the forum state, see McGee v. Int'l Life Ins. Co., 355 U.S. 220, 221, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957);
>
> . whether the defendant owns property in the forum state, see Base Metal Trading, Ltd. v. OJSC, 283 F.3d 208, 213 (4th Cir. 2002);

. whether the defendant reached into the forum state to solicit or initiate business, <u>see</u> <u>McGee</u>, 355 U.S. at 221; <u>Burger King [Corp. v. Rudzewicz]</u>, 471 U.S. [462,] 475-76 [(1985)];

. whether the defendant deliberately engaged in significant or long-term business activities in the forum state, <u>see</u> <u>Burger King</u>, 471 U.S. at 475-76, 481;

. whether the parties contractually agreed that the law of the forum state would govern disputes, <u>see</u> <u>Burger King</u>, 471 U.S. at 481-82;

. whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship, <u>see</u> <u>Hirschkop & Grad, P.C. v. Robinson</u>, 757 F.2d 1499, 1503 (4th Cir 1985);

. the nature, quality and extent of the parties' communications about the business being transacted, <u>see</u> <u>English & Smith [v. Metzger]</u>, 901 F.2d [36,] 39 [(4th Cir. 1990)]; and

. whether the performance of contractual duties was to occur within the forum, <u>see</u> <u>Peanut Corp. of Am. v. Hollywood Brands, Inc.</u>, 696 F.2d 311, 314 (4th Cir. 1982).

<u>Consulting Eng'rs Corp. v. Geometric Ltd.</u>, 561 F.3d 273, 278 (4th Cir. 2009) (emphasis in original except in bracket). "If, and only if, [a court] find[s] that the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." <u>Id.</u>

B. Analysis of Defendants Laliberte's and NTC's Motion

Defendants Laliberte and NTC argue that neither general jurisdiction nor specific jurisdiction exists in this Court. (Docket Entry 35 at 5-13.) Plaintiffs respond that their contacts

with North Carolina sufficiently establish specific jurisdiction. (<u>See</u> Docket Entry 41 at 6-7.)[5]

According to Defendants Laliberte and NTC: (1) "they do not have sufficient minimum contacts with [North Carolina][,]" "[b]ecause [they] did not purposefully avail themselves of [its] benefits" (Docket Entry 35 at 6-9); (2) Plaintiffs' claims did not "ar[ise] out of [Defendants Laliberte and NTC's] activities directed to North Carolina" (<u>id.</u> at 9); and (3) the exercise of personal jurisdiction over them "would be unreasonable and offend traditional notions of fair play and substantial justice" (<u>id.</u> at 9-13). Plaintiffs answer that Defendants Laliberte and NTC had "contacts with North Carolina directly related to the lawsuit" (Docket Entry 41 at 10) and "it is not unreasonable for [Defendant Laliberte and NTC] to defend a case in North Carolina related to the venture" (<u>id.</u> at 12).

### 1. Purposeful Availment

Defendants Laliberte and NTC argue that Plaintiffs have failed to establish purposeful availment because: (a) many of the relevant

_____

[5] Plaintiffs' titled their personal jurisdiction argument, "This Court has Personal Jurisdiction over Defendants as a result of Defendants' Contacts with North Carolina," and their argument related to purposeful availment appears in a subsection titled, "Defendants had Continuous and Purposeful Contacts with North Carolina that Relate Directly to the Claims at Issue in this Lawsuit." (Docket Entry 41 at 5 (normal capitalization applied).) Plaintiffs do not make general jurisdiction arguments (<u>see</u> <u>id.</u> at 6-11), rather their arguments focus on specific jurisdiction (<u>see, e.g.</u>, <u>id.</u> at 6 ("where the claim arises or is related to the defendant's contacts (specific jurisdiction) the contact required by due process need not be systematic or continuous to support jurisdiction"), 7 ("a defendant still has sufficient minimum contacts to support specific jurisdiction where the defendant enters into a contract with a resident of the forum . . .").

factors counsel against such a finding (Docket Entry 35 at 7); (b) Plaintiff Edwards initiated the contact with Defendant Laliberte (Docket Entry 45 at 3-4); (c) the agreement with Plaintiffs Sloane and CC and their performance of obligations in North Carolina does not suffice (Docket Entry 35 at 7; Docket Entry 45 at 2); and (d) Defendant Laliberte's electronic communications fall short of purposeful availment (Docket Entry 35 at 7-8; Docket Entry 45 at 6).

<u>a. Absence of Relevant Factors</u>

Defendants Laliberte and NTC contend that the "majority of personal jurisdiction factors set forth in *Consulting Eng'rs. Corp.* . . . weigh in [Defendants Laliberte and NTC's] favor." (Docket Entry 45 at 6; <u>see also</u> Docket Entry 35 at 6-7.) The Court agrees that nearly all of the <u>Consulting Eng'rs</u> factors (<u>see</u> <u>supra</u> at 12-13) do not support a purposeful availment finding. Defendant Laliberte has never traveled to North Carolina and he does not maintain offices or agents in the state. (Docket Entry 35, Ex. A at 2.) He owns no property in North Carolina and has not solicited or initiated business in the forum. (<u>Id.</u>; Docket Entry 28 at 5.) He has "not engaged in long-term business transactions[,]" in North Carolina and did not agree with Plaintiffs that North Carolina law would govern their disputes. (Docket Entry 35, Ex. A at 2.) He did not make any "in person contacts in North Carolina with any Plaintiff" and he has not "consented to be sued" in this state. (<u>Id.</u>) Additionally, he conducted his "activities . . . from [his] office in Edmonton, Alberta, Canada" (<u>id.</u>, Ex. A at 3), and the

project called for the provision of accommodations in British Columbia, Canada (Docket Entry 28 at 4-5).[6]

### b. Initiation of Contact

Defendants Laliberte and NTC state that "great weight" attaches to the factor of "who initiated the contact" and assert that Plaintiff Edwards initiated contact with Defendant Laliberte. (Docket Entry 45 at 3 (internal quotation marks omitted) (quoting Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906, 2006 U.S. Dist. LEXIS 7234, at *16 (M.D.N.C. Feb. 6, 2006) (unpublished) (Tilley, C.J.); and citing Johansson Corp. v. Bowness Constr. Co., 304 F. Supp. 2d 701, 705 (D. Md. 2004)).) Indeed, this Court (per then-Chief Judge N. Carlton Tilley, Jr.) has recognized that "the Fourth Circuit has given great weight to the question of who initiated the contact between the parties." Worldwide Ins., 2006 U.S. Dist. LEXIS 7234, at *14 (citing, inter alia, Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 452 (4th Cir. 2000)). See also Johansson, 304 F. Supp. 2d at 705 ("One of the most important factors is whether the defendant initiated the business relationship in some way.") (internal quotation marks omitted)). In this case, Plaintiff Edwards initiated the business relationship with Defendant Laliberte in Louisiana. (Docket Entry 35, Ex. A at 3.)

---

[6] To the extent the Court relies on evidence from Defendants as to these points, it has done so because Plaintiffs failed to dispute these facts. (See Docket Entry 41 at 5-11.)

Therefore, this significant consideration does not support a finding of purposeful availment.

### c. Contract and Plaintiffs' Performance

Defendants Laliberte and NTC argue that "'[p]ersonal jurisdiction is not conferred by merely signing a contract with a North Carolina resident . . . .'" (Docket Entry 35 at 7 (quoting Boon Partners v. Advanced Fin. Concepts, No. 5:95-CV-427-BO, 1998 U.S. Dist. LEXIS 7812 (E.D.N.C. Mar. 30, 1998) (unpublished)).) Plaintiffs respond that, "[a]s in *English & Smith*, the present lawsuit relates directly to a failed business venture that contemplated performance by [Plaintiffs Sloane and CC] in the forum state and involved significant communication and an ongoing relationship between [Plaintiffs Sloane and CC] and [D]efendants." (Docket Entry 41 at 9.)

An agreement by an out-of-state defendant with a plaintiff does not by itself establish that the defendant purposefully availed itself of doing business in the forum. Burger King, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." (emphasis in original)). However, the Fourth Circuit has held that an out-of-state defendant could become subject to personal jurisdiction within the forum state as a result of transacting business with the plaintiff. See English & Smith, 901 F.2d at 39-40.

In that case, the defendant, a California attorney, associated with a Virginia law firm on a case and, after the case settled, a dispute arose as to whether the plaintiff Virginia law firm should receive payment.  <u>Id.</u> at 37-38.  The district court entered summary judgment in favor of the plaintiff and the defendant appealed based on lack of personal jurisdiction.  <u>Id.</u> at 38.  The Fourth Circuit affirmed and observed that the plaintiff's cause of action arose directly from the defendant's transaction of business in Virginia which included: initiating contact with the plaintiff; "knowing that [the plaintiff] was a Virginia lawyer who likely would do the requested work in Virginia[;]" the last act to execute the contract occurred in Virginia; "[the plaintiff] performed all his duties under the contract in Virginia[;]" and "the parties exchanged numerous telephone calls and written communications."  <u>Id.</u>

This case, however, materially differs from <u>English & Smith</u> because in that case: (1) the defendant initiated contact with the plaintiff; (2) the contract was finally executed in the forum; and (3) "all" of the plaintiff's duties occurred in the forum.  <u>See id.</u> Plaintiffs' argument that Plaintiffs Sloane and CC's performance occurred only within North Carolina ignores the activities of Plaintiffs Edwards and Kelly who directed their activities to Canada.  (Docket Entry 28 at 5-6; Docket Entry 41, Ex. A at 1-2.) Plaintiff Kelly was "negotiat[ing] contracts" with Canadian entities as Plaintiff Sloane's and Defendant Laliberte's employee (Docket Entry 28 at 6), and given that Plaintiff Sloane also paid Plaintiff Edwards, along with Defendant Laliberte (<u>id.</u>; Docket

Entry 21, Ex. D at 2-7), Plaintiff Edwards thus conducted activities within Canada as Plaintiff Sloane's and Defendant Laliberte's employee.

Defendants Laliberte and NTC argue that Plaintiffs' "unilateral activities" do not support personal jurisdiction. (Docket Entry 45 at 2 (citing <u>Worldwide Ins.</u>, 2006 U.S. Dist. LEXIS 7234, at *13-17).) More specifically, Defendants Laliberte and NTC claim that Plaintiffs Sloane and CC's location "was irrelevant" to the parties' arrangement (Docket Entry 35 at 8), and, as a result, their North Carolina actions are "not relevant" (Docket Entry 45 at 2). Moreover, Defendants Laliberte and NTC contend that the Court should "focus on where the Defendants performed (or were to perform) their obligations" and that Plaintiffs "directed their activities" to Canada. (Docket Entry 45 at 3 (citation omitted).) Plaintiffs respond that:

> [Defendant] Laliberte's claim that he did not "consider [Plaintiffs Sloane and CC's] location to be at all relevant" completely disregards the fact that [Plaintiffs Sloane and CC] were essential to the venture notwithstanding their location. It is no different than in *English & Smith*, where the Virginia attorney was hired because he was an expert in forfeiture and his location in Virginia was irrelevant. However, unlike in *English & Smith*, where the Virginia lawyer's final performance was expected to occur in California, defendants here fully intended to use the North Carolina plaintiff's reservation system and reservation staff in North

Carolina.  Defendant Laliberte and Plaintiff Sloane even
agreed that [Plaintiffs Sloane and CC] needed to expand
their reservation staff . . . .

(Docket Entry 41 at 9-10 (italics in original).)[7]

The United States Supreme Court has recognized that "'[t]he
unilateral activity of those who claim some relationship with a
nonresident defendant cannot satisfy the requirement of contact
with the forum State. . . . [I]t is essential in each case that
there be some act by which the defendant purposefully avails itself
of the privilege of conducting activities within the forum State,
thus invoking the benefits and protections of its laws.'"  Burger
King, 471 U.S. at 474-75 (quoting Hanson v. Denckla, 357 U.S. 235,
253 (1958)).  An agreement coupled with a plaintiff's performance
of some contractual obligations in the forum do not show sufficient
contacts by the defendant with the forum.  See United Advertising
Agency, Inc. v. Robb, 391 F. Supp. 626, 631 (M.D.N.C. 1975)
(Gordon, C.J.); accord Cost Mgmt. Performance Grp., LLC v. Sandy
Spring Bank, No. 3:09CV340-RJC-DSC, 2009 U.S. Dist. LEXIS 93380, at

---

[7] Elsewhere in their Response, Plaintiffs state that "[Plaintiff] Sloane
interviewed potential reservationists in North Carolina and eventually hired a
lead reservationist who spoke French" (Docket Entry 41 at 11 (citations
omitted)), and argue that such fact shows that Defendants Laliberte and NTC had
"contacts with North Carolina" (id. at 10).  In the Response to Defendants NT and
NSP's motion to dismiss, Plaintiffs argue in a conclusory manner that "many of
[their] activities in North Carolina, as set forth above, were done in
collaboration with and/or at the direct instruction of defendants, through the
person of Dennis Laliberte." (Docket Entry 50 at 9.)  Plaintiffs appear to refer
to various e-mails that Defendant Laliberte sent to Plaintiff Sloane or Hil-Tec,
charges incurred by Hil-Tec, and Plaintiff Sloane's hiring of a new employee.
(See id.)  Plaintiffs' argument lacks merit, because Plaintiffs fail to explain
how said actions demonstrate a "collaboration" between Defendant Laliberte and
Plaintiffs Sloane and CC to manage the passenger inventory or how such conduct
amounted to direction by Defendant Laliberte on managing the passenger inventory
(see id.).

*10-12 (W.D.N.C. Sept. 9, 2009) (unpublished), recommendation adopted, 2009 U.S. Dist. LEXIS 93376 (W.D.N.C. Oct. 5, 2009).

In addressing this consideration, Defendants Laliberte and NTC devote a great deal of attention to the decision in Worldwide Ins. (see Docket Entry 45 at 2-3). In that case, the North Carolina plaintiff, a provider of "insurance and other financial products and services to independent insurance agencies[,]" entered into an agreement with the Georgia corporate defendant through its president, the other defendant, whereby the corporate defendant would serve as the plaintiff's managing agent in Georgia. Worldwide Ins., 2006 U.S. Dist. LEXIS 7234, at *2-3. The "[d]efendants [were] both located in Georgia and conduct[ed] their business in Georgia[,]" and "[the plaintiff] contacted them in Georgia[.]" Id. at *17 & 20. During the parties' negotiations, the plaintiff's representatives visited Georgia, the individual defendant visited North Carolina, and the parties' remaining negotiations occurred by telephone. Id. at *3. "The [parties'] Agreement . . . required [the plaintiff] to perform certain services for [the corporate defendant] including: 'accounting services, preparation and mailing of a magazine and promotional materials, negotiations with carriers and other providers, preparation and mailing of marketing videos and recruiting kits, and the planning, execution, administration, and payment for sales and training meetings.'" Id. at *4.

The Court observed that, "although [the plaintiff] performed some of its administrative functions under the Agreement at its

-21-

offices in North Carolina, all of the work to be performed by [d]efendants . . . was to take place . . . [in] Georgia." Id. at *16-17. The corporate defendant's employees attended training meetings in North Carolina and other locations at least once a year, and the individual defendant visited the plaintiff's offices eight times. Id. at *4. Approximately, three and a half years after executing the agreement with the plaintiff, the defendants sought to sell the line of business to another company. Id. The plaintiff sued and the defendants filed a motion to dismiss for lack of personal jurisdiction. Id. at *4-6. Under these circumstances, this Court, per then-Chief Judge Tilley, held that the defendants' contact with North Carolina "was hardly so purposeful that litigation in North Carolina could have been reasonably foreseen[,]" id. at *17, and granted the defendant's motion to dismiss for lack of personal jurisdiction, id. at *20.

In this case, Defendant Laliberte's performance in furtherance of the agreement occurred in Canada. (See Docket Entry 35, Ex. A at 3.) Moreover, Plaintiffs Sloane and CC, through its employees, Plaintiffs Edwards and Kelly, directed activities into Canada. (See Docket Entry 28 at 5-6.) Furthermore, Plaintiffs Sloane and CC's North Carolina operations furthered the objective of providing accommodations in Canada. (Docket Entry 21 at 3.) In light of Worldwide Ins., the Court agrees that Plaintiffs Sloane and CC's partial performance of work within North Carolina does not warrant the exercise of personal jurisdiction.

As a final matter, the assertion that personal jurisdiction exists because Plaintiffs Sloane and CC were "essential" to the contract finds no support in English & Smith. Instead, in said case, the Fourth Circuit observed that the defendant knew the plaintiff would work in the forum and said knowledge satisfied purposeful availment in combination with other factors, see English & Smith, 901 F.2d at 39, which, as explained above, are absent here (see supra at 18).

### d. Electronic Communications

As evidence that Defendants Laliberte and NTC "had contacts with North Carolina[,]" Plaintiffs observe that "[Defendant] Laliberte sent over 75 emails to [Plaintiff] Sloane in North Carolina setting forth instructions and discussing other issues related to the Winter Olympic project." (Docket Entry 41 at 10.) Defendants Laliberte and NTC assert that "the various e-mail communications between Plaintiffs and Defendants, some of which were merely forwarded messages sent to Plaintiffs by Defendant Laliberte are not sufficient to show that Defendants established the minimum contacts[.]" (Docket Entry 35 at 7 (citations omitted); see also Docket Entry 45 at 6.) In other words, "even if the quantity [of e-mails] is notable, the quality of those communications often is not." (Docket Entry 35 at 8 (citing Docket Entry 21, Ex. D).)

The Fourth Circuit has recognized that: "[T]he mere fact that emails, telephone calls, and faxes were employed does not, of itself, alter the minimum contacts analysis. <u>The analysis must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state."</u> <u>Consulting Eng'rs</u>, 561 F.3d at 279 n.5 (emphasis added). This Court similarly has declined to find that a defendant's electronic communications sent into the forum generally establishes purposeful availment. <u>See</u> <u>WLC, LLC v. The Learning Co.</u>, 454 F. Supp. 2d 426, 436-37 (M.D.N.C. 2006) (Dixon, M.J.) ("Plaintiff notes that the parties exchanged e-mails and telephone calls in furtherance of the consulting agreement and that some of those e-mails and telephone calls were made from Defendants to Plaintiff in North Carolina. Courts have held, however, that an exchange of communications between two parties, one of whom is located in the forum state, in furtherance of a contract, will not generally constitute purposeful contact with the forum state for purposes of jurisdiction." (citations omitted)), <u>recommendation adopted</u>, <u>id.</u> at 427 (Osteen, Sr., J.).

The Court observes that, over a one-year period, Defendant Laliberte exchanged a number of e-mails with Plaintiffs. (<u>See</u> Docket Entries 21-3, 21-4, 21-5, 21-6, 21-7, 21-8).)[8] In only five of these e-mails, did Defendant Laliberte forward information

---

[8] For purposes of clarity the Court refers to Exhibit A to Docket Entry 21 by the CM/ECF system docket number and page numbers incorporated in the footer of this exhibit, because the exhibit lacks its own independent page numbers and, due to its size, required division into several docket entries (<u>see</u> Docket Entries 21-3, 21-4, 21-5, 21-6, 21-7, 21-8).

without any additional commentary.  (See Docket Entry 21-2 a 2-3, 9-18, 30; Docket Entry 21-5 at 1.)  Among the remaining e-mails, some relate to activities in North Carolina (see, e.g., Docket Entry 21-3 at 17 (discussing partnership agreement); Docket Entry 21-7 at 16 (commenting on Plaintiff Sloane's ability to fund obligations)), but others address events in other locales (see, e.g., Docket Entry 21-2 at 24-28 (discussing employment agreement with Plaintiff Kelly); Docket Entry 21-3 at 3 (discussing Canadian trust account and payment for Plaintiffs Edwards and Kelly); Docket Entry 21-6 at 31 (discussing flight arrival for Plaintiff Sloane)).  Among these e-mails, Plaintiffs have not cited any particular e-mail in which Defendant Laliberte "instruct[ed]" Plaintiffs on how they would perform their duties related to solely North Carolina activities.  (See Docket Entry 41 at 10-11.)  However, examining the facts in a light most favorable to Plaintiffs, Combs, 886 F.2d at 676, the Court finds that some of the e-mails have a connection with North Carolina and, thus, provide some support for the exercise of personal jurisdiction in North Carolina.

Plaintiffs refer to specific e-mail contacts by Defendant Laliberte to further strengthen the weight that the Court should afford to his electronic communications with the forum.  In this regard, Plaintiffs claim that "[Defendant] Laliberte informed [Plaintiffs Sloane and CC] that he was going to assess a $500/day penalty against them if they did not finish certain projects assigned to them on time" (Docket Entry 41 at 10 (citing Docket Entry 21 at 4-5; id., Ex. C)), and such activity constitutes

further evidence of Defendants Laliberte and NTC's contacts with the forum (id.). In the e-mail in question, Defendant Laliberte warned that he would assess daily penalties for missed "agreed upon deadlines" in connection with the "Booking Engine Modifications." (Docket Entry 21, Ex. C at 2.)

According to Plaintiffs, additional evidence of Defendant Laliberte's contacts with North Carolina exists in that:

> [Defendant] Laliberte communicated directly with the North Carolina plaintiffs' vendor, Hil-Tec, Inc. in order to implement changes he wanted made to [Plaintiff CC's] reservation system.
>
> Hil-Tec incurred over $10,000 in charges related to [Plaintiff CC's] reservation system as a result of [Defendant] Laliberte's requests. [Plaintiff CC] was responsible for the charges incurred by Hil-Tec at [Defendant] Laliberte's request.

(Docket Entry 41 at 10 (bullet points and citations omitted).) Defendants Laliberte and NTC argue that the Court should not consider the contacts with Hil-Tec, because "when deciding the existence . . . of specific jurisdiction, courts will only look to the contacts between the parties . . . ." (Docket Entry 45 at 3 (citing CEM Corp. v. Personal Chemistry, AB, 55 Fed. Appx. 621, 624-25 n.2 (4th Cir. 2003)).)

In the case cited by Defendants Laliberte and NTC, the Fourth Circuit stated that "activities . . . [which] have nothing to do with the dispute at issue in this case . . . are irrelevant in any consideration of specific personal jurisdiction." CEM Corp., 55 Fed. Appx. at 624. However, the Fourth Circuit did not reject non-party contacts connected to the "dispute at issue." See id.

Nevertheless, one court in the Fourth Circuit has recognized that "telephonic and internet communication with consultants chosen by Plaintiff after the contract was formed do not rise to the level of purposeful activity to support specific jurisdiction." Cost Mgmt. Performance Grp., 2009 U.S. Dist. LEXIS 93380, at *12 (citing Eagle Paper Int'l, Inc. v. Expolink, Ltd., No. 2:07cv160, 2008 U.S. Dist. LEXIS 4003 (E.D. Va. Jan. 17, 2008) (unpublished)).

Plaintiff Sloane hired Hil-Tec, but Hill and Hil-Tec decided to accept input from Defendant Laliberte even though he had not engaged them for services; moreover, although Hill purportedly accepted Defendant Laliberte's input because Plaintiff Sloane "introduced" Defendant Laliberte over the telephone, Plaintiffs fail to identify any agreement between Defendant Laliberte and Hil-Tec. (See Docket Entry 17, Ex. E at 1-3; Docket Entry 21 at 1-5.) Furthermore, Hil-Tec's decision to charge Plaintiffs Sloane and CC for revisions based on Defendant Laliberte's comments does not alter Defendant Laliberte's relationship with Hil-Tec. Thus, Defendant Laliberte's electronic communications with Hil-Tec do not amount to purposeful availment in this case.

Finally, Plaintiffs indicate that "[Defendant] Laliberte required [Plaintiffs Sloane and CC] to pay $10,000/month for employees hired to assist the Winter Olympic project" and said requirement constitutes another contact by Defendants Laliberte and NTC with North Carolina. (Docket Entry 41 at 10-11.) Plaintiffs fail to acknowledge that, as discussed above, Plaintiffs Edwards and Kelly's employment duties were directed at Canada. Therefore,

-27-

the Court finds Defendant Laliberte's August 8, 2007, e-mail request that Plaintiff Sloane contribute to employee salaries insufficient to establish purposeful availment.

### 2. Summary

In light of the foregoing considerations, an insufficient basis exists to find that Defendants Laliberte and NTC purposely availed themselves of the forum. The relevant facts include: (1) Defendants Laliberte and NTC are not located in North Carolina and neither Defendant Laliberte nor any agent of Defendant NTC traveled to North Carolina; (2) Plaintiff Edwards initiated the contact with Defendant Laliberte in Louisiana; (3) the parties did not reach an agreement in North Carolina; (4) the parties' agreement concerned the provision of accommodations in Canada; (5) Plaintiffs Sloane and CC partially performed their obligations in North Carolina, but paid other individuals to conduct activities in Canada; (6) Plaintiffs Edwards and Kelly, both located outside of North Carolina, directed their activities to Canada; (7) Defendant Laliberte and NTC performed their obligations in Canada; and (8) Defendant Laliberte sent e-mails to Plaintiffs Sloane and CC in North Carolina, but not of such a character as to establish purposeful availment.

In light of these facts, virtually all of the factors cited in Consulting Eng'rs (see supra at 12-13) weigh against a finding of purposeful availment. Moreover, in Worldwide Ins., the defendants' contacts with North Carolina were much more extensive than the contacts Defendants Laliberte and NTC had with the forum in that

the defendants in <u>Worldwide Ins.</u> made in-person visits to this state over a much longer period of time; nonetheless, this Court (per then-Chief Judge Tilley) found purposeful availment lacking.

Because Plaintiffs failed to show that Defendants Laliberte and NTC purposefully availed themselves of the privilege of conducting business in North Carolina, the Court need proceed no further. <u>See</u> <u>Consulting Eng'rs</u>, 561 F.3d at 278. In sum, Plaintiffs have not made "a prima facie showing" of personal jurisdiction, <u>Combs</u>, 886 F.2d at 676. Thus, Defendants Laliberte and NTC's motion to dismiss for lack of personal jurisdiction should be granted, without regard to the alternative issue of forum non conveniens.

### C. Analysis of Defendants NT and NSP's Motion to Dismiss

Defendants NT and NSP request dismissal of this action for lack of personal jurisdiction, or, alternatively, pursuant to the doctrine of forum non conveniens. (Docket Entry 47 at 1.) The parties' briefs are substantially similar to the briefs filed with respect to the previously-discussed motion. (<u>Compare</u> Docket Entries 48, 50, 52; <u>with</u> Docket Entries 35, 41, 45.)[9] In particular, Plaintiffs contend that Defendants NT and NSP's

---

[9] In the Response to Defendants NT and NSP's motion to dismiss, Plaintiffs claim that <u>Worldwide Ins.</u> is distinguishable on its facts, because the plaintiff's activities in the forum amounted to "administrative functions" and that, "[b]y contrast, the activities of [P]laintiffs . . . formed the very foundation of the Winter Olympic project." (Docket Entry 50 at 10.) This distinction lacks significance in that the "administrative functions" as described in <u>Worldwide Ins.</u>, <u>see</u> <u>Worldwide Ins.</u>, 2006 U.S. Dist. LEXIS 7234, at *4, are not materially distinguishable from Plaintiffs Sloane and CC's "manage[ment] [of] passenger inventory" (<u>see</u> Docket Entry 21 at 3).

contacts with North Carolina are sufficient to establish specific jurisdiction.  (See Docket Entry 50 at 3-11.)

Moreover, Plaintiffs' purposeful availment arguments are based on the same conduct by Defendant Laliberte discussed in the preceding subsection.  (See id.)  Accordingly, for the reasons previously discussed (see supra at 14-29), Plaintiffs have failed to show that Defendants NT and NSP purposely availed themselves of the forum.

In addition, Defendants NT and NSP argue that, "since [Defendant NSP] was not formed until after the events complained of in the Amended Complaint, any contacts that occurred between Defendant Laliberte and Plaintiffs prior to that time could only have been made by [Defendant] Laliberte individually or in his capacity of President of [Defendant NT]."  (Docket Entry 48 at 3.)  Plaintiffs argue that:

> [E]ven if [the assertion that Defendant NSP was created subsequent to the occurrence of the allegations in the Amended Complaint] is true, [Defendants NT and NSP] ignore the fact that [Defendant] Laliberte, a partner and agent of [Defendant NSP] did indeed have significant contacts with Plaintiffs, including contacts in North Carolina.  As a result of these contacts, [Defendant NSP], through its agent [Defendant] Laliberte, in turn used [P]laintiffs' efforts, expertise, and capital investments to obtain an agreement to provide cruise ships for the Vancouver Olympics, while improperly failing to compensate [P]laintiffs.

(Docket Entry 50 at 11 n.4.)  Plaintiffs have not identified any purposeful availment by Defendant Laliberte after the formation of Defendant NSP on January 15, 2009, and they have not identified any activity by Defendant NSP in North Carolina after its formation.

(See Docket Entry 50 at 1-11.) Nor have Plaintiffs cited any authority for the proposition that a partnership would become subject to personal jurisdiction in a forum based upon actions taken by a partner in that entity prior to the formation of the partnership. (See Docket Entry 50 at 11 n.4.)

Under these circumstances, Plaintiffs have failed to show that Defendants NT and NSP purposefully availed themselves of the privilege of conducting business in North Carolina. As a result, the Court need not address the second and third prongs of the specific jurisdiction test, see Consulting Eng'rs, 561 F.3d t 278. Defendants NT and NSP's motion to dismiss for lack of personal jurisdiction should be granted, irrespective of their arguments regarding the doctrine of forum non conveniens.

## III. CONCLUSION

Plaintiffs have failed to make "a prima facie showing" of personal jurisdiction over Defendants, Combs, 886 F.2d at 676. Therefore, Defendants' motions to dismiss for lack of personal jurisdiction should both be granted.

**IT IS THEREFORE RECOMMENDED** that the Motion to Dismiss Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the Alternative for *Forum Non Conveniens* (Docket Entry 34) filed by Defendants Laliberte and NTC be **GRANTED** on grounds of lack of personal jurisdiction and **DENIED AS MOOT** as to the doctrine of forum non conveniens.

**IT IS FURTHER RECOMMENDED** that the Motion to Dismiss Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the

Alternative for *Forum Non Conveniens* (Docket Entry 47) filed by Defendants NT and NSP be **GRANTED** on grounds of personal jurisdiction and **DENIED AS MOOT** as to the doctrine of forum non conveniens.

    /s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

July 19, 2011